Mr; Justice CATRON.
I feel myself bound to dissent, from the foregoing opinion — for the following reasons:
1. By the act of 29th May, 1830,.a. preemption right settler then in possession was • entitled to enter with' the register of the Land-office in the district where the land lay," by legal subdivisions, not more ffian one hundred, and sixty acres.
The controversy before us turns, partly, on what was the true “ legal subdivision” of fractic nal section 22, containing two hundred and three acres: This must be ascertained from the laws on the subject éxisting in 1830. The lines of public surveys actually run and marked in the field, are township extensions, and section boundaries; the'lines dividing sections mto quarters,, half-quarters, (and quarter-quarters since 1832,) being only indicated, or depicted upon the township plats returned and recorded in the office of the register.
The act .of 26th March, 1804, provides for the- first time for the sale of the public lands in qúarter-sections; and also directs (sect. 9) that fractional sections shall be sold entire; or by uniting two or more together. The act of February 11th, 1805, directs with absolute precision, leaving no discretion on the subject, the manner in which foil sections shall.be divided info quarters: but makes no. provision for thé subdivision of fractional sections. It was-not until the passing of the act of April 24, 1820, that these were authorized to be'subdivided; and then only when they contained more than one hundred and sixty acres. The act”of 1820, in directing the manner in which full sections shall be subdivided into half-quarters, or eighty acre' lots, is as absolutely.precise in its provisions as that-of 1805; and, as in the former case, gives no discretionary power so far as these subdivisions are' concerned — -but in authorizing the subdivision of fractional sections-containing one hundred and sixty acres and upwards, it directs that they shall in like manner, “ as nearly as practicable,” be subdivided into half-quarter-sections, or eighty-acre lots — '!C under such rules and regulations, as may be prescribed by the secretary of the Treasury.” Under the discretionary power here given, - rules 'and regulations were prescribed by Secretary Crawford, on the 10th of June, 1820, (2 Land Laws and Opinions, *669 p. 820, No. 796.) .'A circular was addressed to the surveyors-general pf that date, for their government- in this respect, by the commissioner of the General Land-office: It orders that fractional sections, containing'more than one hundred and sixty acres, shall be divided into half-quarter-sections, bv north and south, or east and west linés, so as to preserve the most compact and convenient forms. “ You will, therefore,” says the 'commissioner, “be pleased to divide the fractional sections in youir district, (which remain unsold,) in the. manner above directed, and deport to this office, and to the registers of the land-district in which- those fractions respectively are situate, the subdivisions, together with the quantity in each. It is not intended to run the subdivisionaí lines, and mark them, but merely to make them upon your survey^, and calculate the quantity of land in each subdivision.” ■
In January, 1826, (2 Land Laws, p. 583, No. 841,) further instructions were given on this-subject, to the surveyor-general at Washr ington, Mississippi. . The commissioner says, among other things — • “ A fractional section is a tract of land not bounded by sectional lines on all sides, in consequence of the intervention of rivers, &c,, and containing a less quantity than six hundred and forty acres.”
Speaking of'the regulations, and the circular letter founded on them, the commissioner continues: “ The substance of the rule is, that fractional sections of one -hundred and sixty acres and upwards are to be subdivided by east and.west, or north and south lines,-at the discretion of the surveyor, so ás to preserve the most compact and convenient forms. Each lot to be, as nearly as practicable, a half-quarter-section, containing a quantity of eighty acres; sometimes rather more, sometimes less, as the locality demands.”
According to these instructions, fraction No. 22 was divided: two precise eighty-acre tracts could not be made out of it; half-quarters, or eighty.acres, was the least quantity that could be sold by the act of 1820, if in regular form and part of a full section ; but if in irregular fornq and the fraction of a section, containing upwards of one hundred and sixty acres, then it was left to the secretary to cause it to be subdivided according to his own regulations, into two or mpre tracts, ■ approaching, “ as nearly as practicable,” to eighty acres each. lie directed the subdivisions to be made in all cases so as to preserve the most compact and saleable forms, accommodating the' tracts to the sides of rivers, or other legal intervening boundaries to subserve the best interests of the government. This practice has prevailed as the governing rule for nearly a quarter of a century, and is now in full operation — large quantities of land have been sold thus subdivided; and great- quantities yet remain to be sold. I speak on information derived from the commissioner of the General Land-office. The idea of taking out of a fraction a quarter-section of one hundred and sixty acres, if found there, as if the section was entire, and leaving surrounding strips of a few acres each, unsaleable *670 and of little or no value, as will be the case here, never has been entertained at that office, as the true construction of the'act of 1820, from the date of Mr. Crawford’s instructions, (June 10th, 1820,) up to this time. On mature consideration, I think the instructions given legitimately within the authority conferred on the secretary. In this view of the law, as applicable to the present case, I am supported by the opinion of the attorney-general, given on Etheridge’s claim in 1837, (2-Land Laws and Opinions, p. 136, No. 85.)
2. Suppose, however, it was doubtful whether they were or not authorized, is it admissible for the courts of justice, after such a lapse of time, to call in question the construction given to the act; to disturb so many titles taken under it — and to break up existing subdivisions? The sole authority to which the act referred for its exposition, and the prescribing of rules- and regulations to carry it into execution, was the secretary of the Treasury. His jurisdiction was subject to no supervision-; he was constituted the only judge, from whose decision there was no appeal on part of purchasers; they were .compelled to buy in the form; and quantity, the lands were offered for sale, or not be permitted to purchase at all. The secretary having adjudged and settled the construction of the act according to his views of its true meaning, and this coeval with its passage — a strong circumstance: the government in its executive and political departments, and the community at large concerned in purchasing from the government, having acquiesced without complaint, recognising the construction as the tru.e one, through' so. great a lapse of years, it is'now supposed by me,-the duty of this court, on the question being presented here, and. that for the first time, to acquiesce also. That these subdivisions are for the best interests of the United Statés is manifest; all others have abided by them, ¿nd so should the plaintiff.
If one of our own judgments made in 1820, coeval with the statute, had produced similar consequences; if many thousands of titles rested on it, (as there surely'do on Mr.'Crawford’s instructions,) I should feel myself wholly unauthorized, at this day, to overthrow the decision, however doubtful I might think it to be. The conservative . rule of communis error fadt jus, is universal in courts of justice, in regard to their own judgments, under such circumstances; and'undoubted' judicial propriety requires its adoption, as it seems to. me, when dealing with the decision of the secretary in the present instance. This course is peculiarly due to the repose of titles, and the stable maintenance of an established system in a great department; a system that cannot be changed in this respect without much expense,. confusion, and delay, in the'administration of that de--partment.
3. But suppose the secretary was mistaken, and the subdivision, of fractional section 22 is illegal; what then is the plaintiff’s case ? His title is a patent; on his legal title he must recover, therefore he *671 cannot be heard to say his patent is void because founded on an illegal subdivision: the question then is reduced to this; what does the patent cover ? Etheridge had no peculiar rights by the- act of 1830, save that he had a preference of entry ; libé others purchasing of the United States he was compelled to buy in legal subdivisions; before 1820 not less than an .entire fractional section could be sold; nor after the act of that year, could one be sold in subdivisions until divided, under regulations by the secretary of the Treasury. Further than this, the act of 1805 remained unchanged, as to fractions. Etheridge could not be permitted to treat a quarter-section in a fraction, although found there,, as if it was found in an entire section. He did attempt it¿ in proving up his preference right, but when he applied to enter at the Land-office the register rejected his claim, and compelled him to take the land on which he resided in the form and quantity it had been laid off according td the instructions; and this he did take. The government is bound by its patent; is estopped to disavow the subdivision granted; andas estoppels are mutual, Etheridge is equally bound, by the grant. . It recites the patent certificate ;-this says it is for ninety-two acres and sixty-seven hundredths, bounded “according to.the official plat, of the survey of the said lands, returned to the General Land-office by the surveyor-general— which said tract, described in the plat returned, has been purchased by the said James Etheridge.”, The plat is part of the patent certificate; is referred to in thé patent, and-is part of that also, just as much as if it was attache d-to'the same papej. ' By the plats of public surveys, lands must be identified, and the boundaries ascertained, in all cases of the bind. ■ The parties agree of record that exhibit No. 2 is- the official map described in the patent of Etheridge; according to this, he purchased lot A for ninety-two acres and sixty-seven hundredths; his eastern boundary being the red line made by the surveyor-general, pursuant to the instructions. ' This was undoubtedly the. land the government intende,d to sell, and, as I think, as certainly +he samé Etheridge intended:to buy, and did buy; of course-Jbe can recover no land' east of that line, and therefore the judgment ought to be affirmed, even if the instructions were illegal and void.
4. The case does not stop here: Stone’s patent is elder than Efheridge’s; the same plat is referred to.in each; Stone’s is for the one hundred and ten acres and fifty hundredths east of the red line., This is not disputed. To overcome it, Etheridge’s patent must be supported by a legal entry for’ the same land, elder than Stone’s patent. As already stated, until Etheridge paid his money, he could have no legal entry from which to date his title. There being no such subdivision existing in law -as the south-west quarter of fractional section 22, when Etheridge'presented his occupant claim, he could not be permitted to enter in .that form, or for that quantity. Such was the express instruction of May 31, 1831, (2 Land Laws *672 and Instructions, No. 497, and again.in No..521.) The first subdivision was created afterwards by the act' of the surveyor-general, and is indicated by the red line. That it is denominated.the- south- , west quarter in the patent, ^amounts, in my judgment, to very little ; thus, the department saw proper to call such subdivisions; the deno-. mination was arbitrary and n.ot precise, but we cannot discard the substance for the sake of correcting terms of description open to verbal criticism. 1'he land contained in plat referred.to in Ethe-' ridge’s patent, is a technical quarter-section in the -language -of the General Land-Office; and such subdivisions are known by no other name there, as will, be-seen by No. 48.3 and No. 486 in the volume of. Instructions above referred to. ■' Thus in No. 483, dated July 28, 1830, the commissioner instructs the register at Mount Salus, that , the pre-emption' law of that year restricted the quantity to be located to one.hundred and sixty, acres, or a quarter-section; but that it did not intend that an excess over one hundred and sixty acres, “ in a tract of land technically known as a quarter-section,”- should be cut .off so as to restrict the quantity literally to one hundred and.sixty acres. “'The law, (says he,) having, taken it for granted that every quarter-section contains one hundred and -sixty ..acres; which not being the fact, we must be guided by what we know to be the spirit and intention of the law.” He then instructs the register, in cases of fractional sections, to conform to the subdivisions as made by the surveyor-general, and to give-the quantity-'as near as practicable _
_ No. 486 is a-general circular, dated September 14, 1830, on the same subject in part. * Instruction 8 directs :• “ Although a quartersectiori may be found to contain rather more than the ordinary quantity of one 'hundred and sixty acres, the right of pre-emption is extended to the full quantity of such quarter-section.” In the language, therefore, pf -the General Land-office, the south-west-quarter of fractional section 22, called for in Etheridge’s patent, is as well known by its designation, as if the section was entire. This the Instruction No. 497 above, explains, where the subdivided quantity is less, to be a “ technical” quarter also, as well as'if .the quantity had been more. But if there be uncertainty, here, as in former cases, We must refer to the plat and quantity to explain the uncertainty. This course was pursued in the case of McIver v. Walker, 9 Cranch, 173, and again in 4 Wheaton, 444. There the plat was held to control the face of. the patent, and-fixed a different locality, because Crow creek -was laid down on the plat, nearly through its .centre; the location certificate copied in the patent, as in this case, called for-a beginning, and for courses from that point, running off .from -the creek, which was not named as being crossed by the lines;' yet this court disregarded the calls, and held the land .lay on both sides of the creek, as indicated in the naked plat. It was a much weaker case than the present. In patents of the United States, from their-earliest date down to this day, nothing is referred to but num *673 bérs on the public surveys. To-hold that the-surveyS'did not explain and cóntrob the patent asdo identity, and-side dines, would bean abandonment of. both; as nothing else- can establish either.
Much stress is laid on the fact that the half-mile post is found on the.south boundary, of section22. The- same line-marks are. uniformly made. on all1, sectional lines,, regardless'of fractions': so it would have been done had thé fraction 22 been for less than .one hundred,-and sixty acres, and- not subjected to subdivision. The section south may . have been, entire; and the corner post necessary for the purposes^ of that section. •
■ Another difficulty stands in the way of the plaintiff’s recovery. Stone’s .patent is the elder; it is admitted .it covers the land in dispute — -the patent passed the-perfect and • consummate title-; in an action.‘of ejectmentthe patent is'conclusive, as was held by this court in Wilcox v. Jackson, and Bagnell v. Broderick, 13 Peters, 516, 450. You can only go behind it, and give it earlier date, from a" precise legal entry for the same land made by the grantee, to overreach an elder .patent; as this court held in Ross v. Barland, 1 Peters, 655. We have seen Ethértdge did not enter the land in dispute when he paid -his money, and took -his patent certificate. To overthrow Stone’s patent, we must rely on the preference right to enter. At best,-it is. á remote and doubtful equity; Stone paid for the land, (and.if the assumption be. true,) has an equity attached to it for his purchase m’oney; presenting arcase of conflicting equities,s with which a court of law cannot deal.. In the language of'this court in Baghell v. Broderick, "we are bound to presume for the purposes of this action; that all previous legal steps had been taken by Stone to entitle himself to the patent, and.that he had the. superior right to obtain, it, notwithstanding the claim set up by Etheridge; and having obtained the'patent, Stone ¿áti the best title known to a court of law, to wit, the fee.” 'There a much more imposing equity than .Etheridge can pretend to, was set up. In no respect, therefore, is there .any ground for. reversing, the decision of the Supreme Court of Alabama, a*, is. supposed by me.
In.,the case of Brown et ux. v. Hunt,. Mr. Justice Daniel dissents, from the opinion of the court, and concurs in opinion with Mr. Chief Justice and, Mr. Justice CatroN.